**IN THE UNITED STATES DISTRICT COURT** RECEIVED
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION** 2020 OCT 13 A 10 55

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| **SHEILA WILLIAMS,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | 2:20-cv-822 |
| **AETNA LIFE INSURANCE** | ) | |
| **COMPANY; HARTFORD LIFE &** | ) | |
| **ACCIDENT INSURANCE** | ) | |
| **COMPANY; and HOME DEPOT** | ) | |
| **WELFARE BENEFITS PLAN,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## COMPLAINT

Plaintiff Sheila Williams ("Plaintiff") brings this action for violations of the

Employee Retirement Income Security Act of 1974 committed by Aetna Life

Insurance Company ("Aetna") and Hartford Life & Accident Insurance Company

("Hartford") (collectively, "Defendants") in connection with the provision of

ERISA-governed disability benefits under the Home Depot Welfare Benefits Plan

sponsored by Plaintiff's former employer, The Home Depot, U.S.A., Inc. In support

of the relief requested herein, Plaintiff alleges the following upon personal

knowledge as to herself and as to all other matters upon information and belief based

upon, *inter alia*, the investigation made by and through her attorneys:

## INTRODUCTORY STATEMENT

1.    This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA"). This suit is brought pursuant to 29 U.S.C. § 1132(a) to secure disability benefits from the Home Depot Welfare Benefits Plan due to Plaintiff through the group long-term disability insurance policy issued by Aetna, administered at least in part by Hartford in concert with or on behalf of Aetna, and sponsored by The Home Depot, U.S.A, Inc.

2.    The Plaintiff seeks all benefits to which she may be entitled should this Court determine she is "disabled," including long-term disability benefits under policies issued or administered and underwritten by Aetna and/or Hartford.

3.    Plaintiff seeks such benefits together with any other disability-related benefits her plan may provide based on the conditions documented in her medical records and assessment information. Chief among these conditions is her development of neuropathic pain during her recovery from surgery in 2017 on her feet to correct protruding bones that themselves caused intense pain and discomfort.

4.    This neuropathic pain, described in her claim records as being "excruciating," prevents her from being able to stand or ambulate safely over the course of a day, which in turn caused her to be unable to lift or carry safely any weight.

2

5.     A Functional Capacity Examination included in her claim file reports after the completion of objective testing of her functionality that she is not capable of performing at a "sedentary" level of physical exertion.

6.     The pain leaves her unable to maintain focus and energy over the course of a typical workday or workweek, such that she cannot maintain a fulltime work schedule generally, rendering her totally vocationally disabled according to a vocational assessment that is included in her claim file as well.

## JURISDICTION

7.     Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

8.     Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

9.     Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District and Defendant may be found or resides in this District.

3

## PARTIES

10.     Plaintiff Sheila Williams is a participant in the Plan at issue and thus entitled to benefits available thereunder.

11.     Defendant Aetna is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

12.     Aetna, which is identified in documents represented by Aetna and Hartford to be the complete claim file as the entity that issued the group policy (which has not been provided to the Plaintiff throughout her claim process) to the Plan, is a "fiduciary" of The Plans as that term is defined by 29 U.S.C. § 1002(21).

13.     One of Aetna's designated agents for service of process is:

> CT Corporation System
> 2 North Jackson Street, Suite 605
> Montgomery, AL 36104

14.     Aetna is an entity exercising authority or control respecting the management or disposition of Plan's assets or the personnel exercising said authority over Plan assets.

15.     Aetna is an entity providing services to The Plan at issue.

16.     Aetna is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

17.     Defendant Hartford is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

4

18.     Hartford, which correspondence during the evaluation of Plaintiff's claim identifies as being the entity having considered and determined Plaintiff's eligibility for her LTD benefit, is a "fiduciary" of The Plans as that term is defined by 29 U.S.C. § 1002(21).

19.     One of Hartford's designated agents for service of process is:

CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

20.     Hartford is an entity exercising authority or control respecting the management or disposition of Plan's assets or the personnel exercising said authority over Plan assets.

21.     Hartford is an entity providing services to The Plan at issue.

22.     Hartford is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

23.     Home Depot Welfare Benefits Plan ("the Plan") is an "employee welfare benefit plan" as defined within 29 U.S.C. § 1001, et. seq., and may be served with process by serving:  Home Depot Welfare Benefits Plan, c/o The Home Depot U.S.A., Inc., 2455 Paces Ferry Road SE, Atlanta, GA 30339.

24.     The Plan is a separate entity for which either or both Defendants are obligated to make LTD benefit payments.

5

## THE PLAN

25.     The Home Depot Welfare Benefits Plan's long-term disability benefit is funded entirely by a group long-term disability policy sold by Aetna, the company which also underwrote this group policy.

26.     This group policy was purchased by Plaintiff's employer to confer certain benefits upon Plaintiff and other employees made available by the Home Depot Welfare Benefits Plan.

27.     As a result, this policy qualifies as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under the Plans as that term is used in 29 U.S.C. § 1132.

28.     Under the terms of this Plan which provides for an income protection benefit upon the Plaintiff becoming disabled, the Plaintiff is "disabled" as this Plan defines this term.

29.     According to the "Aetna Life Insurance Company Booklet-Certificate" (hereafter, "the Certificate") provided as part the Defendants' production of Plaintiff's claim file, the "Test of Disability" to determine whether a participant is eligible for LTD benefits is as follows:

6

From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:

- You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition; and
- Your earnings are 80% or less of your adjusted predisability earnings.

*After the first 24 months of your disability* that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an illness, injury or disabling pregnancy-related condition.

30.     Pertinent to continued eligibility for benefits beyond 24 months of disability, the Certificate defines "reasonable occupation" as follows:

## Reasonable Occupation
This is any gainful activity:
- For which you are, or may reasonably become, fitted by education, training, or experience; and
- Which results in, or can be expected to result in, an income of more than 60% of your **adjusted predisability earnings**.

31.     There are no Plan documents indicating that either Aetna has an enforceable grant of discretionary authority as Plan or Claims Administrator or that any express delegation has occurred for this benefit.

32.     There are also no Plan documents indicating that Hartford has an express delegation of discretionary authority to adjudicate claims.

33.     Such documents referenced in the foregoing paragraph have been requested from the Plan Administrator and no such documents have been produced.

## DEFENDANTS' LIABILITY

34.     Plaintiff began her working life out of high school, starting as a clerk at a small country grocery near Selma, Alabama.

35.     She eventually left that job for an associate position at Wal-Mart in

7

Montgomery. Wal-Mart recognized Plaintiff's dedication and work-ethic by promoting her to a Department Supervisor position.

36.    During this same time, Plaintiff consistently sought to increase her work opportunities and increase her earning potential, so she attended classes for a period at Concordia College in Selma, Alabama in its business program. The demands of her full-time work in a managerial position with Wal-Mart, however, made it difficult also to maintain her coursework. Plus, she was continuing to advance a career in retail, so she saw better potential at the time for emphasizing her continued work over additional education.

37.    For this reason, Plaintiff soon left Wal-Mart and over the course of several years worked in different managerial capacities for Bombay Company and Enterprise Rent-a-Car before joining Home Depot in 2008 as a Department Supervisor overseeing three (3) different areas of the store.

38.    Again, her work ethic and dedication led to quick advancement and she was promoted to Assistant Store Manager and was also assigned responsibility for overseeing the hardware and "pro sales" parts of the store (in addition to the sections for which she was already a supervisor).

39.    Her Assistant Store Manager position was a demanding, but rewarding, role. It involved the management of all the associates within the store and of all customer service issues among all departments.

8

40.    Plaintiff was also responsible for generating sales through "leads" generated by associates, completing and ensuring the accuracy of numerous periodic internal reports, and helping personally to drive foot-traffic within the store and increase overall sales.

41.    These responsibilities required stamina throughout the week, and even each day, to perform and complete, because they carried the expectation that she walks the floor of the store at all times, for up to 15 miles per day on weekdays and 20 miles per day on weekends.

42.    As is expected of any manager, Plaintiff was also expected to help other employees throughout the store and help them complete their responsibilities as needed.

43.    Plaintiff first began having problems with her feet in around 2011 and 2012 while she was a Department Supervisor. At that time she began experiencing "severe and unusual pain" in her feet. This pain was a "rubbing pain as if there was a raw area" on her foot that had become sore.

44.    Plaintiff managed this pain as effectively as she could, until eventually it became enough for her to consult with a doctor (Dr. Vaugh, whose records Hartford has) about it. He informed her at the time that a bone in her foot had become displaced and recommended surgery.

45.    Plaintiff's medical records document the completion of surgery on her

9

right foot in January 2017 and then on her left foot in August 2017.

46.    These surgeries were uneventful for the most part, inasmuch as she recovered from them well from a structural perspective involving her feet (meaning, her issues with a protruding bone were fixed).

47.    However, a new problem developed soon after the August 2017 surgery, where she then began experiencing a burning and aching sensation in her left foot.

48.    Plaintiff found this pain to make it "even more difficult than before to keep working at all…."

49.    Because of the pain, Plaintiff found herself unable to stand safely, which in turn affected all her other physical abilities, such as lifting and carrying.

50.    Still, Plaintiff tried to keep working, both out of love for her work and her co-workers and out of her need to support herself because she had no other means of income or support since she has no family living with her or children to help take care of her.

51.    Ultimately, while not being able to stand or walk the store as Plaintiff once did was a problem, her most pressing problem at the root of everything was her inability to maintain the focus and energy need to complete a fulltime work schedule because of the increased pain.

52.    Back when Plaintiff was still trying to work through this, she reports

spending all of her off-days recuperating by doing things like keeping her feet elevated and not permitting anything to touch her foot so she could have a break from the intense pain.

53.    Plaintiff's pain has since increased to the point that even a sheet touching her foot while in bed "is excruciating."

54.    Plaintiff's reports of excruciating pain track her medical records.  Dr. Vaughn observed there to be a neuropathic element to Plaintiff's pain that went beyond the results of her foot surgery.

55.    However, Defendants did not make any inquiry into this area during their review and investigation of this claim from its inception. Instead, at the outset, Defendants focused on Plaintiff's recovery from her bunion surgery on both of her feet.

56.    On the basis of these two surgeries over 2017, Defendants approved Plaintiff's LTD benefit upon finding that she could not perform "the material duties of her own occupation" under the "Test of Disability" set forth in the Certificate.

57.    Defendants thereafter continued to find Plaintiff disabled and qualified for benefits under this term for 24 months, but still based on Plaintiff's the "repair" effectuated by these surgeries and not on her development of neuropathic pain.

58.    Eventually, in a letter dated December 19, 2019, Defendants, through a letter identifying The Hartford as the issuing entity, informed on behalf of the

Defendants that Plaintiff's LTD claim was considered to be closed and terminated January 6, 2020 because Defendants found she did not meet the new definition of "Totally Disabled" in her policy which took effect after two years of benefit payments.

59.     This letter expressed the Defendants' view that Plaintiff is able to perform work having a "sedentary" physical demand level.

60.     Defendants then concluded that new occupations in which Plaintiff may work which would afford her at least 60% of her Pre-Disability Earnings included "Merchandising Manager" at $50.74 per hour, "Supervisor Order Taker" at $24.93 per hour, and "Repair Work Order Clerk" at $21.39 per hour.

61.     Defendants' determination was without consideration of the existence or validity of Plaintiff's pain caused by her Reflex Sympathetic Dystrophy ("RSD"), or her limitations caused by this condition. Instead, Defendants continued their focus the repair accomplished after her 2017 bunion surgery.

62.     This meant that Defendants' investigation into Plaintiff's claim was demonstrably incomplete because Plaintiff's attending physicians, including specifically Dr. Vaughn, consistently reported and directly observed Plaintiff to be experiencing real and significant pain in her feet having a neuropathic element.  She had not recovered because of this development.

63.     Dr. Vaughn, in fact, had reported in a statement provided to Defendants

in early 2020 the following:

| Primary condition: Foot Pain | ICD-9 Code: ☐ |
| | ICD-10 Code: ☑ M79.672 |
| Secondary condition(s): Neuritis | ICD-9 Code: ☐ |
| | ICD-10 Code(s): ☐ |

Subjective symptoms: Moderate to severe pain of left foot when standing walking sitting and lying down. Now starting in the right foot.

Objective Physical Findings (Please include office notes for date(s): _____ to _____
Pain on palpation of submetatarsal head #1 left; Pain on palpation and Tinel's Sign of the Tibial and Dorsal cutaneous nerves.

64.   Reports and records such as this should have resulted in more investigation into the nature of Ms. Williams's "moderate to severe pain" and the degree to which it <u>measurably</u> impacted her functionality.

65.   After learning of the denial of her claim, Plaintiff, though counsel requested the production of all documentation "relevant" to the adverse benefit determination she had received as that term is defined under Department of Labor regulations.

66.   Defendants responded to this request with the production of documents it identified as being what it maintained for Plaintiff's claim file, which included the Certificate noted above.

67.   Plaintiff at that time also issues a request for Plan documents to Home Depot U.S.A., Inc. in its capacity as Plan Administrator for the documentation that establish its LTD plan.

68.   Neither production includes documents showing an express grant of

13

discretion has having been given either to Aetna or Hartford to make any findings of fact or interpret Plan provisions.

69.     Upon receipt of the claim file, however, the foregoing issue over the completeness of the Defendants' investigation continued to be apparent, because this underlying documentation revealed no investigation had taken place involving, or inquiry made into, the most critical element of Plaintiff's condition at that time, which was her neuropathic pain, or Reflex Sympathetic Dystrophy Syndrome ("RSD").

70.     In light of this notable gap in Defendants' administration of her claim, Plaintiff submitted to an independent evaluation where the presence of RSD was confirmed.

71.     The independent evaluator, who is Board certified in Occupational Medicine, found there to be "substantial corroborating evidence to warrant Ms. William's [sic] limitations and restrictions as stated by her treating physicians and as verified by [his] examination."

72.     The evaluating physician further found her to present "with a classic case of [RSD} in her left foot following bunion surgery" and confirmed through his examination that Plaintiff is unable to engage in meaningful employment in any capacity because of the impact of her pain on her ability to function in *any* position, not just standing or walking.

14

73.     In short, the evaluating independent physician found Plaintiff could not earn a gainful income that meets or exceeds her policy's earnings qualifier (60% of her pre-disability earnings) because she does not have the ability to work enough hours during the typical week to reach that earning level.

74.     Plaintiff at this time also submitted to a functional capacity examination to assess through objective testing the limits of her functionality.  That FCE result was entirely consistent with the independent physician evaluator, revealing that Plaintiff had a "less than SEDENTARY physical demand level because of objective indicators of "significant pain" associated with a variety of maneuvers.

75.     The professional performing the FCE also observed Plaintiff as reasonably requiring lengthy rest breaks at times and concluded based on his results and observations that Plaintiff "is unable to work a full time (8 hour/day) job." [*Id.*]

76.     When Plaintiff submitted these objective, in-person assessments and evaluations for an independent review by a vocationalist, the vocationalist too concluded that Plaintiff is "100% vocationally disabled."

77.     Plaintiff sent these independent assessments and reviews to the Defendants with her written appeal lodged on June 10, 2020 pursuant to the instructions given to her by the Defendants in their December 19, 2019 decision letter via facsimile and U.S. certified mail.

78.     Defendants received the appeal by fax that same day – June 10, 2020 -
- according to the transmission confirmation report.

79.     Defendants themselves confirmed receipt of the appeal on that same
date in a letter of confirmation dated June 15, 2020.

80.     Defendants then received the original of the appeal through U.S.
certified mail on June 29, 2020 according to the certified return receipt.

81.     On July 28, 2020, after having heard nothing from the Defendants about
the status or consideration of Plaintiff's appeal (other than Defendants' June 15,
2020 letter confirming receipt of the appeal as of June 10), Plaintiff, through counsel,
informed Defendants that she considered her appeal to have been deemed denied by
operation of law under Department of Labor regulations and Plan terms since no
written decision had been received within the 45 days of the appeal's receipt.

82.     Plaintiff also requested the immediate production of her claim record
through that deemed-denial date in that same letter.

83.     Thirteen days later, Plaintiff, through counsel, received through the
mail a letter from Defendants dated July 16th stating that the Defendants wished to

16

avail themselves of an extension for rendering a decision pursuant to relevant regulations and plan terms through and until August 13, 2020, but did not articulate their reasons for needing more time.

84.    Plaintiff acknowledged Defendants' tardy letter on August 12, 2020, and in a letter faxed to Defendants that same day, asked that all future correspondence from Defendants be sent via facsimile or email so there is no question when it was sent in light of the suspicious circumstances surrounding Defendants' July 16th letter and its dating.

85.    Having heard nothing from the Defendants even as to the new date for rendering a decision that they had claimed in that July 16th letter (that date being August 10th), Plaintiff, through counsel, faxed a letter on August 17, 2020 stating the following:

Dear Ms. Corbin:

This is to mark the fact that no written decision has yet been received as of today's date, August 17, 2020. This means that Hartford's decision is late even under its own calculation of its deadline, which was August 13th. That calculation is found in Hartford's last letter dated July 16th which we received a few days ago.

I understand Hartford's failure to render a decision to be further affirmation of Hartford's intent to deny Ms. Williams's appeal by way of a deemed denial by operation of law. If we are wrong about this and it is Hartford's intent intention to pay this claim, I once again ask that we be notified as soon as possible, and that payment be made immediately in accordance with the notice provided previously in this matter.  If you believe I have miscalculated the due date for this decision, please let me know that as well.

Very sincerely,

*M. Clayborn Williams*

M. Clayborn Williams
clay@erisacase.com

86.     Defendants responded to Plaintiff with a letter sent via fax the next day (August 18, 2020) stating that it had yet again *mailed* a letter it said had been dated August 6th invoking another extension, this time for "an additional 45 days" that, when added to the previous extension through August 10th, meant an anticipated new decision date of September 24th, which was **106 days** after Plaintiff first lodged her appeal.

87.     Defendants attached a copy of what it claimed at that time to have sent; this letter again gave no explanation or reasons for the additional time needed, other than to indicate that Defendants had not completed their review and still were not able to make a written decision.

88.     The following day, Plaintiff, through counsel, responded that no such

18

letter had been received as of that date – prior to being sent the alleged copy of it on August 18th -- and asked for the confirmation of when it had been faxed as Plaintiff had requested be done.

89.    Defendants responded in correspondence dated August 20, 2020 stating it was not faxed, only mailed, claiming they were unaware of Plaintiff's request for future correspondence to be faxed until after this second extension letter was sent.

90.    Plaintiff received that purportedly mailed letter on September 6, 2020, 30 days after it was allegedly dated. But the postmark on the envelope in which it was sent stated it was actually mailed on August 27, 2020, indicating the letter was postdated and that Defendants' representations about its timing were false.)

91.    Defendants also took the position that their time for rendering a decision commenced on June 29, 2020 when they received the mailed version of the appeal, not June 10th when they received the appeal via facsimile (again, which they expressly confirmed on June 15th). This is an arbitrary interpretation by Defendants improperly extending unilaterally their time for issuing a written decision prejudicing the Plaintiff who is without the income benefit this Plan was to provide.

92.    On that same day, Defendants sent a separate letter attaching a review of medical records it had since obtained through Reliable Review Services, an insurance company claim administration vendor, to support its view that Plaintiff's claim was not payable despite the examination information she had provided with

19

her appeal.

93.   This review was no different from the review Defendants had previously done, however, and only repeated the problems of the earlier review they had conducted, ignoring Plaintiff's true conditions and neuropathic pain and her providers' statements about the same.

94.   On September 4, 2020, Defendants provided a new "Employability Analysis Report" that took the deficient medical records review performed by Reliable Review Services and applied it against possible occupations that fit that report and at the same time provided for a median income that satisfied the earnings qualifier in Plaintiff's policy under her new disability definition. This as yet another out-of-time review in which Defendants sought to add a post hoc rationalization to the denial by operation of law that had already occurred on the claim.

95.   That being the case, on September 14, 2020, that being the 95th day after Defendants received Plaintiff's appeal, Plaintiff wrote the following to the Defendants:

Dear Ms. Corbin:

       This is to note your recent letters that I continue to receive beyond the expiration of your time for timely deciding this claim. None of the extensions invoked thus far cite any special circumstances. Instead, the only reason given is that you are delayed in making a decision. Our position that this claim is deemed exhausted – and therefore denied by operation of law -- remains. However, if you feel it would be improper for Ms. Williams to proceed with a lawsuit at this point, please provide a detailed explanation for those reasons within seven days from today's date.

       Very sincerely,

       M. Clayborn Williams
       clay@erisacase.com

96.    Defendants provided their lengthy response to this request for their positions in their faxed letter dated September 18, 2020.

97.    In that letter, they claimed to have received confirmation from Plaintiff's Counsel's office that they did not have "the complete appeal" as of June 10, but as of June 29th, appearing to refer to the mailed version's inclusion of a CD that provided the evidentiary record to cited throughout the appeal summary itself that was what had been faxed on June 10th.

98.    They then contended that their invocations of several extensions were both valid and timely and that they were not in violation of ERISA's (or the Plan's) temporal requirements.

99.    Plaintiff responded to Defendants' positions in a letter dated September 21, 2020, explaining in detail why the Defendants' assertions about the validity and

timeliness of their extensions were counterfactual and contrary to established law.

100.   Plaintiff then asked for Defendants to clarify why they contend their review process to have complied specifically with 29 C.F.R. § 2560.503-1(h)(4) based on their own recitation of applicable facts; no such clarification has yet been received as of the filing of this Complaint.

101.   Plaintiff also observed in that same letter that the reviews Defendants had provided belatedly in the course of Plaintiff's appeal consideration were not substantively different from the review Defendants originally performed when they terminated and closed Plaintiff's claim in December 2019.

102.   Specifically, the reviews disregard and outwardly ignore the Plaintiff's independent examinations involving a Board Certified physician specializing in occupational medicine and a functional capacity evaluation and keep going back to what is and is not described in Plaintiff's various medical records.

103.   Plaintiff also noted with respect to the vocational report that it assumed incorrectly that Plaintiff would be able to command a level of compensation that was far beyond entry level for each of the various jobs it had identified.

104.   On September 29, 2020, Defendants issued a written explanation of reasons for the denial of Plaintiff's appeal for the first time on Plaintiff's appeal lodged on June 10th.

105.   This written explanation, therefore, was not issued until **111 days** after

the appeal was faxed, and **92** days after Defendants received the same letter sent via certified mail which included hundreds of pages the appeal letter referenced.

106.   This written explanation did not respond to any of the questions or issues raised in Plaintiff's September 21, 2020 correspondence.

107.   Plaintiff's appeal remains therefore deemed exhausted by operation of law under Plan terms and Department of Labor regulations, with Defendants' out-of-time written explanation of reasons for that denial constituting an *ad hoc* rationalization of that denial.

108.   Plaintiff is presently entitled to seek judicial review her claim under a *de novo* review standard because there is no <u>timely</u> written decision to which the Court may defer.

109.   In addition to failing to provide a timely written appeal decision, the Defendants have also failed to provide a full and fair review of Plaintiff's claim through the following procedural deprivations:

> (a)   Failing to maintain adequate claims procedures, or any procedures *at all*, in compliance with Department of Labor regulations;
>
> (b)   Targeting of Plaintiff's claims for denial because ERISA governs;

(c)    Failing to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(d)    The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of her claim;

(e)    Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all her claim;

(f)    Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(g)    Failing to accord any weight to Plaintiff's medical providers and other examiners who personally examined the Plaintiff, some on a regular basis;

(h)    Failing to adhere to the terms of the Plan, including as to the timely acceptance and processing of a claim for benefits and ensuing appeals;

24

(i)     Purposefully limiting and curtailing the review of its medical personnel and vendors and otherwise improperly exerting influence on them to opine against payment of benefits;

(j)     Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff and instead relying on a duplicative paper review of Plaintiff's records; and

(k)     Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how her conditions impacted one another.

110.    Despite Plaintiff's established disability and entitlement to coverage under the terms of the LTD plan, Defendants have failed to determine that Plaintiff remained "disabled" under the Home Depot plan and refused to find her to be continued to be qualified for disability benefits.

111.    As set forth above in connection with Defendants' fiduciary breaches, Defendants' claim decision was the product of a conflict of interest whereby they allowed their own financial interests to supersede their fiduciary obligations. Under *Glenn*, this presents an additional reason for application of a *de novo* standard to their claim decision.

112.    This conflict of interest further calls into question the credibility of Hartford's claims personnel and reviewers which Aetna appears to have used to perform the administration of this claim.

113.     These persons considered the applicability of ERISA before making its decision to deny Plaintiff's claim at the initial level and again at the appeal level.   This presents an additional reason for application of a *de novo* standard to their claim decision.

114.     The Defendants' decision process did not comport with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations. In fact, Defendants did not issue any written decision *at all* on Plaintiff's appeal within the time required under the Plan and relevant regulations.

115.     Plaintiff has exhausted all Plan remedies even though Defendants' failure to adhere to Plan terms or ERISA requirements and regulations did not require it.  As such, this case is ripe for judicial review.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sheila Williams respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.    For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plan and Policy identified in this Complaint, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.    For a judgment against the Defendants and the Plan awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c.    For an order requiring Defendants and the Plan to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan; and

d.    Such other relief as may be deemed just and proper.

27

Respectfully submitted,

David P. Martin (ASB-3500-M68D)
M. Clayborn Williams (ASB-9101-A43M)
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com
david@erisacase.com

**Plaintiff's Address:**

Sheila Williams
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendant's Address:**

Aetna Life Insurance Company
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

Hartford Life & Accident Insurance Company
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

Home Depot Welfare Benefits Plan
c/o The Home Depot U.S.A., Inc.
2455 Paces Ferry Road SE
Atlanta, GA 30339